**2322-CC01038**

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

**IN THE CIRCUIT COURT FOR THE CITY OF ST. LOUIS
TWENTY-SECOND JUDICIAL CIRCUIT
STATE OF MISSOURI**

| | |
|---|---|
| John Doe,<br><br>*individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>SSM Health Care Corporation d/b/a SSM Health,<br><br>Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

<u>**CLASS ACTION PETITION**</u>

Plaintiff John Doe is a former patient of SSM Health Care Corporation d/b/a SSM Health ("SSM Health" or "Defendant") who brings this class action against Defendant in Plaintiff's individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions, Plaintiff's counsels' investigation, and, upon information and belief, as to all other matters, as follows:

1. This case arises from Defendant's intentional, reckless, and negligent disclosure of Plaintiff's and Class Members' confidential and private medical information to Meta Platforms, Inc., d/b/a Meta ("Facebook").

2. Defendant's website (https://www.ssmhealth.com/) (hereinafter, the "Website") contain a well-known Facebook tracking pixel (the "Pixel" or "Facebook Pixel") that secretly enables the unauthorized transmission and disclosure of Plaintiff's and Class Members' confidential medical information to Facebook.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

3.      In doing so, Defendant unlawfully discloses to Facebook Plaintiff's and Class Members' personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") contained in the confidential communications between Defendant and its patients.

4.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

5.      If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

6.      Defendant, as a medical provider, occupies a position of trust and care beyond that of the normal commercial relationship. Making this exposure of Plaintiff's and Class Members' Private Information even worse is that it was no accident; this was not the work of a third-party hacker. Instead, Defendant did this itself, by choice and for commercial reasons in contravention of the trust placed in it.

7.      When an individual visits the Defendant's website, the Facebook Pixel causes that individual's unique and persistent Facebook ID ("FID") to be transmitted to Facebook alongside other Private Information.

8.      A pixel is a piece of code that "tracks the people and [the] type of actions they

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

take"[1] as they interact with a website. The Facebook Pixel can be used to track an array of actions and events, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and what text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box). The Facebook Pixel is programmable, meaning that the Defendant controls which events are tracked and transmitted to Facebook.

9.    Pixels are routinely used to target specific customers by utilizing the data gathered through the pixel to build profiles for the purposes of retargeting and future marketing. Upon information and belief, Defendant utilized the Pixel data for marketing purposes in an effort to bolster its profits.

10.    Operating as designed and as implemented by Defendant, the Pixel allowed the Private Information that Plaintiff and Class Members entrusted to it to be unlawfully disclosed to Facebook.

11.    For example, when Plaintiff or a Class Member accessed Defendant's website, the website visitor's internet browser automatically and surreptitiously sent their Private Information to Facebook as they navigated, interacted, and communicated with Defendant's website. This occurred on every web page hosting the Facebook Pixel because the underlying software instructs the website visitor's browser to communicate and transmit information to Facebook.

12.    The information sent to Facebook includes Private Information that Plaintiff and Class Members submitted to Defendant's website, including for example, the type and date of a medical appointment and physician. Such Private Information would allow a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. This type of

---

[1] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited Apr. 5, 2023)

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

disclosure could also allow a third party to reasonably infer that a specific patient was being treated for a specific type of medical condition such as, for example, cancer, pregnancy, or HIV.

13.    Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on the Private Information submitted to Defendant's website.

14.    For instance, Plaintiff submitted medical information on the Website and used the Find-A-Doctor feature to find a psychologist, psychiatrist, and primary care provider. Plaintiff also used the Website to find medical testing options.

15.    Shortly thereafter, Plaintiff started receiving advertisements to Plaintiff's Facebook page ("Facebook Advertisements") related to the medical information that Plaintiff disclosed via the Website.

16.    The products offered in the Facebook Advertisements purported to provide the same relief as the prescription medication that Plaintiff communicated to Defendant via the Website. In other words, the Facebook Advertisement used the Private Information Plaintiff communicated to Defendant to target Plaintiff with advertising.

17.    Defendant regularly encourages Plaintiff and Class Members to use its digital tools, including the Website, to receive healthcare services. Plaintiff and Class Members provided their Private Information through Defendant's website with the reasonable understanding that Defendant would secure and maintain any Private Information as confidential.

18.    Plaintiff and Class Members provided Private Information to Defendant in order to schedule and receive medical services with the reasonable expectation that Defendant would protect their Private Information.

19.    At all times that Plaintiff and Class Members visited and utilized Defendant's

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

website, they had a reasonable expectation of privacy in that the Private Information collected through the Website, including that it would remain secure and protected and only utilized for medical purposes. Plaintiff and Class Members relied on Defendant to secure and protect the Private Information and not disclose it to unauthorized third parties without their knowledge or consent.

20. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchange with Defendant.

21. Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members communications and Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals with whom they were in a position of trust to protect and safeguard that information from unauthorized disclosure.

22. Defendant, however, failed in its obligations and/or promises by utilizing the Facebook Pixel on its Website as described further below, knowing that such technology would transmit and share Plaintiff's and Class Members' Private Information with unauthorized third parties.

23. While Defendant willfully and intentionally incorporated the tracking Pixel into its website, Defendant has never provided advance, clear, written (or otherwise) disclosures to Plaintiff or Class Members that it shares their sensitive and confidential communications via the website with Facebook. As a result, Plaintiff and Class Members were unaware that their PII and PHI were being surreptitiously transmitted to Facebook as they communicated with their

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

healthcare provider via the Website.

24.    Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through Facebook Pixels;  (v) failing to warn or otherwise adequately disclose material facts to Plaintiff and Class Members; and (vi) otherwise failing to design, and monitor its website to maintain the confidentiality and integrity of patient PII and PHI.

25.    Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information. Plaintiff expressly disclaims punitive damages.

26.    Plaintiff seeks to remedy these harms and bring causes of action for (1) breach of fiduciary duty; (2) breach of confidence; (3) unjust enrichment; (4) breach of implied contract; (5) invasion of privacy; (6) cause of action under *Brandt v. Medical Defense Associates*, 865 S.W. 2d 667 (Mo. 1993); (7) violations of Mo. Rev. Stat. § 407.010 *et seq*.

**PARTIES, JURISDICTION, & VENUE**

27.    Plaintiff is a natural person and citizen of Missouri, residing in St. Louis, Missouri. Plaintiff brings this case anonymously to protect Plaintiff's private and confidential medical and health information.

28.    On numerous occasions, from 2018 to present, Plaintiff accessed the Website on

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Plaintiff's mobile device and/or computer in the City of Saint Louis, Missouri. Plaintiff used the Website to find and obtain a physician specialized in treating a condition for which Plaintiff intended to seek treatment, and Plaintiff communicated information about Plaintiff's medical condition, treatments, and symptoms via the Website. Pursuant to the systematic process described herein, Plaintiff's communications were disclosed to Facebook, and this data included Plaintiff's PII, PHI, and related confidential information. Defendant disclosed this Private Information without Plaintiff's advanced knowledge, consent, or express written authorization.

29.    Defendant SSM Health is a 501(c)(3) non-profit corporation organized under, and governed by, Missouri law. SSM Health is headquartered at 3 City Place Drive, Ste. 700, St. Louis, Missouri.[2] SSM Health operates care delivery sites throughout the state of Missouri, including hospitals, physician offices, post-acute facilities, comprehensive home care, hospice services, and other healthcare service locations. It is one of the largest employers in every community it serves.[3] SSM Health is, therefore, a citizen of the State of Missouri.

30.    Venue is proper under Mo. Rev. Stat. 407.025(1), as this Circuit is where the transaction complained of took place.

31.    Venue is proper under Mo. Rev. Stat. 508.010(4) as (a) there is a count alleging a tort and in which the Plaintiff was first injured in the state of Missouri; and (b) Plaintiff was first injured by the acts or conduct alleged in the action in the City of Saint Louis.

32.    Namely, pursuant to Mo. Stat. § 508.010(8), Plaintiff is deemed to have first injured under in the county in which the invasion was first published. Specifically, Plaintiff's Private Information was first tracked and sent to Facebook from his computer and/or mobile device while

---

[2] https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?page=beSearch&ID=664088 (last visited: May 8, 2023).

[3] https://www.ssmhealth.com/resources/about (last visited: December 19, 2022).

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

located in the City of St. Louis.  Thus, the Private Information was published in the City of Saint Louis.

33.    Pursuant to Mo. Stat. § 508.010(12), the provisions of this section shall apply irrespective of whether the defendant is a for-profit or a not-for-profit entity.

## COMMON FACTUAL ALLEGATIONS

### *Defendant Improperly Disclosed Plaintiff's and Class Members' Private Information*

34.    Defendant encourages and promotes Plaintiff's and Class Members' use of its digital healthcare platform, the Website, with the goal of increasing profitability.

35.    To accomplish this, upon information and belief, Defendant utilized Facebook advertisements and intentionally installed the Pixel on its website. The Pixel is a piece of code that Defendant used to secretly discloses to Facebook patients' activity and experiences on Defendant's Website and related electronic platforms.[4]

36.    Plaintiff and Class Members did not intend or have any reason to suspect their Private Information would be shared with Facebook or that Defendant was tracking their every movement and disclosing the same to Facebook when they entrusted Defendant with highly sensitive Private Information.

37.    Defendant did not disclose to or warn Plaintiff or Class Members that: (1) Defendant used their confidential electronic medical communications and Private Information for marketing purposes; or (2) tracked and disseminated their Private Information via the Facebook Pixel.

38.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information.

---

[4] *Id.*

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

39.    Upon information and belief, Defendant improperly disclosed the following confidential information to Facebook:

a.    Plaintiff's and Class Members' status as medical patients;

b.    Plaintiff's and Class Members' communications with Defendant through its Website;

c.    Plaintiff's and Class Members' medical appointments, location of treatments, specific medical providers, and specific medical conditions and treatments;

d.    Plaintiff's and Class Members' personal identifying information, including their unique and persistent Facebook User ID ("FID"); and

e.    Other sensitive and medical information contained within Defendant's website.

40.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented technology (i.e., the Facebook Pixel) that surreptitiously tracked and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Facebook—an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent

***Defendant uses Source Code to Divert Private Information***

41.    Web browsers are software applications that allow consumers to exchange electronic communications over the internet.

42.    Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

43.    When a patient uses Defendant's website and undertakes various actions, the patient and Defendant are engaged in an ongoing back-and-forth exchange of electronic

communications taking place via the patient's web browser and Defendant's computer server.

44.     These communications are invisible to ordinary consumers[5] because they consist of HTTP Requests and HTTP Responses operating in the background of the user's web browser. One browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

- **HTTP Request:** an electronic communication sent from the website visitor's browser to the website's corresponding server. In addition to specifying a particular URL (i.e., web address), "GET" HTTP Requests can also send data to the host server, including cookies. A cookie is a small text file that can be used to store information on the client device which can later be communicated to a server or servers.  Some cookies are "third-party cookies" which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response:** an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

45.     A patient's HTTP Request essentially asks the Defendant's website to retrieve certain information (such as a "Find a Doctor" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Webpage(s)).

46.     Every webpage is comprised of both Markup and "Source Code." Source Code is

---

[5] See HHS Bulletin § *What is a tracking technology?* ("Tracking technologies collect information and track users in various ways, many of which are not apparent to the website or mobile app user.")

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

47.    Source code may also command a web browser to send data transmissions to third parties via pixels or web bugs, tiny 1x1 invisible GIF files that effectively open a spying window through which a website funnels data about users and their actions to third parties.

48.    The third parties to whom the website transmits data through pixels or web bugs do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes.

49.    The web bugs are tiny and camouflaged to purposefully remain invisible to the user.

50.    Thus, without any advanced knowledge, express written authorization, or action by a user, a website developer like Defendant can use its source code to commandeer the user's computing device, causing the device in this case to contemporaneously and invisibly re-direct the users' Private Information to third parties.

***The Facebook Pixel***

51.    The Defendant secretly deployed the Pixel on its website and used it to disclose Plaintiff's and Class Member's Private Information in violation of its common law, statutory, and regulatory duties and obligations.

52.    The Facebook Pixel, a marketing product, is a "piece of code" that allows businesses to "understand the effectiveness of [their] advertising and the actions [patients] take on [their] site."[6] It also allows businesses, including Defendant, to optimize the delivery of ads, measure cross-device conversions, create custom audiences, learn about the website, and decrease

---

[6]  https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Apr. 5, 2023)

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

advertising and marketing costs.[7]

53.    Most importantly, it allowed Defendant and Facebook to secretly track and redirect patients' communications on Defendant's website and patient portal.

***Facebook's Platform and Its Business Tools***

54.    Facebook operates the world's largest social media company.

55.    In 2021, Facebook generated $117 billion in revenue.[8] Roughly 97% of that came from selling advertising space.[9]

56.    As a core part of its business, Facebook maintains profiles on users that include the user's real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, including IP addresses.

57.    Facebook also tracks non-Facebook users through its widespread internet marketing products and source code.

58.    Facebook then sells advertising space by highlighting its ability to target users.[10] Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Facebook compiles this information into a

---

[7] *Id.*

[8] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Apr. 5, 2023)

[9] *Id.*

[10]    FACEBOOK,    WHY    ADVERTISE    ON    FACEBOOK, https://www.facebook.com/business/help/205029060038706 (last visited Apr. 5, 2023).

[11] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Apr. 5, 2023).

[12] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

59.    Indeed, Facebook utilizes the precise type of information disclosed by Defendant to identify, target, and market products and services to individuals.

60.    Advertisers can also build "Custom Audiences."[14] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," including the Facebook Pixel.[17]

---

https://www.facebook.com/business/ads/ad-targeting (last visited Apr. 5, 2023).

[13] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences (last visited Apr. 5, 2023).

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Apr. 5, 2023).

[15] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting (last visited Apr. 5, 2023).

[16] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Apr. 5, 2023).

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

61.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18] Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

62.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19] Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[20] Advertisers can even create their own tracking parameters by building a "custom event." [21]

63.     The Facebook Pixel is one such Business Tool. Facebook offers this piece of code

---

https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Apr. 5, 2023).

[18] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087 (last visited Apr. 5, 2023).

[19] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Apr. 5, 2023).

[20] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Apr. 5, 2023)

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/. (last visited Apr. 5, 2023)

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

to advertisers, like Defendant, to integrate into their websites. As the name implies, the Facebook Pixel "tracks the people and type of actions they take."[22] When a user accesses a website hosting the Facebook Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect. This transmission is initiated by Facebook code the Defendant voluntarily added to the Website and is sent concurrent with patients' communications with Defendant's website. Said differently, the Facebook Pixel is able to send a copy of Class Members' communications to Defendant and Facebook.

64.     An example illustrates the point. Plaintiff and Class Members submitted medical information to Defendant via the Website. Because Defendant utilizes the Facebook Pixel, the Website's Source Code sends a secret set of instructions back to the individual's browser, causing it to secretly duplicate communications with Defendant. As a result, a second and identical set of information is automatically and instantaneously sent to Facebook's servers without the Website visitors' knowledge. The image below illustrates this process:

---

[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM



65. This second transmission is sent alongside additional information that transcribes the communication's content and the individual's identity.

66. Consequently, when Plaintiff and Class Members visited Defendant's website and entered their Private Information to Defendant's website, it was automatically transmitted to Facebook, including, but not limited to, appointment type and date, physician selected, specific button/menu selections, content typed into free text boxes, demographic information, email addresses, phone numbers, and emergency contact information.

67. For example, the images below demonstrate that, as a patient communicates their health information to the Website, that information is duplicated and sent to Facebook.

68. For example, the first image indicates that a patient has used the Website to search for a provider by Specialty or Condition (here, ADHD Attention deficit hyperactivity disorder) and who is currently accepting new patients and offering online appointment scheduling services.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM



69.     The next image shows the information that is sent to Facebook when the patient enters their search parameters. The word "PageView" communicates the fact that the user viewed the webpage above, and the URL information (highlighted in yellow below) communicates the fact that the patient used the "find-a-doctor" tool to locate a physician who is "accepting new patients," offers "online-scheduling," and treats "adhd attention deficit hyperactivity disorder." The users' zipcode was also communicated to Facebook.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

▼ **Request Headers**

```
:authority: www.facebook.com
:method: GET
:path: /tr/?id=533188793867876&ev=PageView&dl=https%3A%2F%2Fwww.ssmhealth.com%2Ffind-a-doctor%2Fdoctorslist%2F
adhd-attention-deficit-hyperactivity-disorder%2Fonline-scheduling%2Faccepting-new-patients%3FIsFromLandingPa
e%3Dtrue%26Zipcode%3D53715%26Radius%3D25%26AcceptingNewPatient%3Dtrue%26OnlineScheduling%3Dtrue%26PageSize%3D
20&rl=https%3A%2F%2Fwww.ssmhealth.com%2Ffind-a-doctor&if=false&ts=1672859866763&sw=1920&sh=1080&v=2.9.90&r=s
able&ec=0&o=28&it=1672859866449&coo=false&rqm=GET
:scheme: https
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding: gzip, deflate, br
accept-language: en-US,en;q=0.9
cookie: sb=G1UJYYwZM-i797zPAJe7wSMo; datr=G1UJYcU6fHxA7S_dXYoksRLp; c_user=150          xs=13%3A_J9153zJbvWkKg
3A2%3A1672416877%3A-1%3A2663%3A%3A3AAcVNxbZlZ077xN2nOKiicGSXbmhu-axDDYXMp7j5uA; fr=0h8pcRNO2Xh8qjCcn.AWWWbwJvW
DT9QOB9vzYsF1XMSo.Bjtc-a.3g.AAA.0.0.Bjtc-a.AWU-ORgmOqI
referer: https://www.ssmhealth.com/
sec-ch-ua: "Not?A_Brand";v="8", "Chromium";v="108", "Google Chrome";v="108"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; WOW64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.0.0 Safar
i/537.36
```

70.     The image above also contains the patient's Facebook ID, which appears as the "c_user" ID highlighted above.[23]

71.     Accordingly, during the same unauthorized transmissions, the Website routinely provides Facebook with its patients' Facebook IDs, IP addresses, and/or device IDs or other the information they input into Defendant's website, like their home address, zipcode, or phone number. The Plaintiff's and Class Members' identities could be easily determined based on the Facebook ID, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed, meaning Defendant has failed in its duty to adequately anonymize the personal Private Information of Plaintiff and the members of the Class.

---

[23] To preserve the Facebook user's anonymity, the c_user ID has been partially redacted.

72.     The Facebook Pixel also intercepts and transmits information that patients type into search boxes, e.g., "do I have covid" or forms that request confidential information like patient contact information, medical histories, insurance and financial information, and Social Security numbers.

73.     For example, the image below depicts what happens when a patient types the phrase "I have female incontinence" into the Website's search bar:



```
▼ Request Headers
  :authority: www.facebook.com
  :method: GET
  :path: /tr/?id=272252120841273&ev=PageView&dl=https%3A%2F%2Fwww.ssmhealth.com%2Fsearch%3Fsearchtext%
  3DI%2Bhave%2Bfemale%2Bincontinence%26searchmode%3Danyword&rl=https%3A%2F%2Fwww.ssmhealth.com%2Fsear
  ch%3Fsearchtext%3Dfemale%2Bincontinence%26searchmode%3Danyword&if=false&ts=1672861426389&sw=1920&sh
  =1080&v=2.9.90&r=stable&ec=0&o=28&it=1672861426065&coo=false&rqm=GET
  :scheme: https
  accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding: gzip, deflate, br
  accept-language: en-US,en;q=0.9
  cookie: sb=G1UJYYwZM-i797zPAJe7wSMo; datr=G1UJYcU6fHxA7S_dXYoksRLp; c_user=150        xs=13%3A_J915
  3zJbvWkKg%3A2%3A1672416877%3A-1%3A2663%3A%3AAcVNxbZ1Z077xN2nOKiicGSXbmhu-axDDYXMp7j5uA; fr=0h8pcRNO
  2Xh8qjCcn.AWWWbwJvW9DT9QOB9vzYsFlXMSo.Bjtc-a.3g.AAA.0.0.Bjtc-a.AWU-ORgmOqI
  referer: https://www.ssmhealth.com
  sec-ch-ua: "Not?A_Brand";v="8", "Chromium";v="108", "Google Chrome";v="108"
  sec-ch-ua-mobile: ?0
  sec-ch-ua-platform: "Windows"
  sec-fetch-dest: image
  sec-fetch-mode: no-cors
  sec-fetch-site: cross-site
  user-agent: Mozilla/5.0 (Windows NT 10.0; WOW64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.
```

74.     After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, Facebook will associate the information with the visitor's Facebook ID and corresponding Facebook profile, i.e., their real-world identity.

75.     A user's Facebook Profile ID is linked to their Facebook profile, which generally

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary   person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

***Defendant Violated Industry Standards***

76.     A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

77.     The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

78.     AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

79.     AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

80.     AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

81.    The Direct Marketing Association, the leading industry group for companies, both for-profit and non-profit, that market to consumers, publishes principles of ethical business practices for marketing practices such as those in which Defendant engages.  The principles are known as the Direct Marketing Association's Guidelines for Ethical Business Practice.[24]

82.    "The Direct Marketing Association's Guidelines for Ethical Business Practice are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct."[25]

83.    The Guidelines are explicit when it comes to the Guidelines' requirement of consent when transferring health-related data.

> These fair information practices and principles apply to any individual or entity that collects, maintains, uses, and/or transfers health-related data for marketing purposes, whether or not marketing is a primary purpose. These principles are applicable to nonprofit as well as for-profit entities.
>
> 1.    Personally identifiable health-related data gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities should not be transferred for marketing purposes without the specific prior consent of those consumers. Health or medical care providers include licensed health care practitioners, such as doctors, nurses, psychologists, pharmacists, and counselors, and those who support health care providers and therefore have access to personally identifiable information, such as insurance companies, pharmacy benefits managers or other business partners, and businesses that sell prescription drugs.
>
> 2.    Personally identifiable health-related data, including the occurrence of childbirth, gained in the context of a relationship between consumers and health or medical care providers or medical treatment facilities (as defined in #1) should not be used to contact those consumers for marketing purposes without giving consumers a clear notice of the marketer's intended uses of the data and the opportunity to request not to be so contacted.
>
> 3.    Personally identifiable health-related data volunteered by

---

[24] Available at https://repository.globethics.net/bitstream/handle/20.500.12424/209969/DMA-Ethics-Guidelines.pdf.
[25] *Id.* at 2.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. Such data should not be collected, maintained, used, and/or transferred for marketing purposes unless those consumers receive, at the time the data are collected, a clear notice of the marketer's intended uses of the data, whether the marketer will transfer the data to third parties for further use, the name of the collecting organization, and the opportunity to opt out of transfer of the data. Such data include, but are not limited to, data volunteered by consumers when responding to surveys and questionnaires. Clear notice should be easy to find, read, and understand.

4. Personally identifiable health-related data inferred about consumers, and gathered outside of the relationship between consumers and health care providers, should also be considered sensitive and personal in nature. These are data based on consumers' purchasing behavior. Such data include, but are not limited to, data captured by inquiries, donations, purchases, frequent shopper programs, advertised toll-free telephone numbers, or other consumer response devices. Any entity, including a seller of over-the-counter drugs, which uses inferred health-related data should promptly provide notice and the opportunity to opt out of any transfer of the data for marketing purposes.

\*\*\*

6. Consumers should not be required to release personally identifiable health-related information about themselves to be used for marketing purposes as a condition of receiving insurance coverage, treatment or information, or otherwise completing their health care-related transaction.

\*\*\*

9. If personally identifiable health-related data are transferred from one direct marketer to another for a marketing purpose, the transferor should arrange strict security measures to assure that unauthorized access to the data is not likely during the transfer process. Transfers of personally identifiable health-related data should not be permitted for any marketing uses that are in violation of any of DMA's Guidelines for Ethical Business Practice.

84.     The Federal Trade Commission has recently taken enforcement action against GoodRx, a telehealth and prescription drug discount provider, for "failing to notify consumers and others of its unauthorized disclosures of consumers' personal health information to Facebook, Google, and other companies."[26]

85.     At least one court has used the DMA's Guidelines as a basis to determine that unethical conduct had occurred and was sufficient to establish a violation of the Missouri Merchandising Practice Act.[27]

***Plaintiff's and Class Members' Expectation of Privacy***

86.     Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

87.     Indeed, at all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

***IP Addresses are Personally Identifiable Information***

88.     On information and belief, through the use of the Facebook Pixel on the Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

89.     An IP address is a number that identifies the address of a device connected to the Internet.

---

[26] FTC, *FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising*, https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising

[27] *See Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 901 (S.D. Cal. 2016).

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

90.    IP addresses are used to identify and route communications on the Internet.

91.    IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

92.    Facebook tracks every IP address ever associated with a Facebook user.

93.    Google also tracks IP addresses associated with Internet users.

94.    Facebook, Google, and other third-party marketing companies track IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

***Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures of Private Information to Facebook***

95.    The sole purpose of the use of the Facebook Pixel on Defendant's website was marketing and profits.

96.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on Facebook.

97.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

98.    Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

99.    By utilizing the Pixel (and thus disclosing Plaintiff's and Class Members' Private Information to Facebook), Defendant's cost of advertising and retargeting was reduced, thereby benefitting Defendant.

***Plaintiff John Doe's Experience***

100.    Plaintiff entrusted Plaintiff's Private Information to Defendant. As a condition of

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

receiving Defendant's services, Plaintiff disclosed Plaintiff's Private Information to Defendant.

101.    Plaintiff accessed Defendant's website to receive healthcare services for Attention Deficit Disorder ("ADD") and/or Attention Deficit Hyperactivity Disorder ("ADHD").

102.    For example, Plaintiff specifically searched and/or clicked on the psychiatry tab on Defendant's website. From there, Plaintiff used Defendant's Website to find a physician to schedule an appointment with a doctor to treat his ADD and ADHD. During this entire time, unbeknownst to Plaintiff, Defendant's Pixel was transmitting this information (i.e., the fact that Plaintiff was seeking medical treatment for psychiatry needs) to third parties, including Facebook.

103.    Plaintiff reasonably expected that Plaintiff's communications with Defendant via the website were confidential, solely between Plaintiff and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

104.    Plaintiff provided Plaintiff's Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

105.    As described herein, Defendant worked along with Facebook and otherwise assisted and enabled Facebook with collecting Plaintiff's highly sensitive communications, including those that contained Private and confidential information. Defendant willfully facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

106.    Defendant transmitted Plaintiff's Private Information to Facebook.

107.    By doing so without Plaintiff's consent, Defendant breached Plaintiff's right to privacy and unlawfully disclosed Plaintiff's Private Information.

108.    Defendant did not inform Plaintiff that it had shared Plaintiff's Private Information with Facebook.

109.    Plaintiff suffered damages in form of (i) invasion of privacy; (ii) loss of benefit of

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

the bargain, (iii) diminution of value of the Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action individually and on behalf of all other persons similarly situated ("the Class") pursuant to Mo. Sup. Ct. R. 52.08(b)(2), 52.08(b)(3) and 52.08(c)(4).

111.    The Class that Plaintiff seek to represent is defined as follows:

**All individual citizens of the state of Missouri whose Private Information was disclosed to a third party by Defendant SSM Health without advanced express written authorization or consent through the Facebook Pixel on Defendant SSM Health's website.**

112.    Excluded from the Class are Defendant, its parents, agents, subsidiaries and affiliates, officers, directors, , affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, Defendant's officers or directors, members of their immediate families, and any Judge who adjudicates this case, including their staff and immediate family, and any successor or assign of any excluded party.

113.    Plaintiff reserves the right to modify or amend the definition of the proposed class or create additional Classes or Subclasses as before the Court determines whether certification is appropriate.

114.    <u>Numerosity</u>, Mo. Sup. Ct. R. 52.08(a)(1). The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are tens of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook and other third parties, and the Class is identifiable within Defendant's records.

115.    <u>Commonality</u>, Mo. Sup. Ct. R. 52.08(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

a.      Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b.      Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

d.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been disclosed to third parties;

e.      Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

f.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

g.      Whether Defendant violated the consumer protection statute invoked herein; and

h.      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

116.    Typicality, Mo. Sup. Ct. R. 52.08(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

117.    Adequacy, Mo. Sup. Ct. R. 52.08(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

118.    <u>Superiority and Manageability</u>, Mo. Sup. Ct. R. 52.08(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

119.    <u>Policies Generally Applicable to the Class</u>. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

120.    The nature of this action and the nature of laws available to Plaintiff and Class

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

121.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

122.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

123.    Further, upon information and belief, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Mo. Sup. Ct. R. 52.08(b)(2).

124.    Likewise, particular issues under Mo. Sup. Ct. R. 52.08(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

a.      Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b.      Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

d.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been disclosed to third parties;

e.      Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

f.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

g.      Whether Defendant violated the consumer protection statute invoked herein; and

h.      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i.      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiff and the Class)

125.    Plaintiff repeats and re-alleges each and every allegation contained in the Petition as if fully set forth herein.

126.    Plaintiff and Class Members sought and paid for medical treatment and services

from Defendant, thereby establishing Defendant as their medical provider.

127.    As Plaintiff's and Class Members' medical provider, Defendant had a fiduciary duty to protect Plaintiff's and Class Members' Private Information and not disclose it to third parties without Plaintiff's and Class Members' consent. *See, e.g., Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 346 (Mo. App. 1983) (noting "a hospital owes a duty of care to its patients, which is independent and apart from the duty of a physician, and which includes a duty of protection."); *see also Fierstein v. Depaul Health Ctr.*, 949 S.W.2d 90 (Mo. Ct. App. 1997) (holding "Missouri courts have extended th[e] fiduciary duty of confidentiality to healthcare centers and hospitals.").

128.    *See also*, the industry standards set forth in Direct Marketing Association's Guidelines for Ethical Business Practice[28] and American Medical Association's ("AMA") Code of Medical Ethics Opinion 3.1.1; 3.2.4; and 3.3.2, *infra*.

129.    Defendant's fiduciary duty to Plaintiff and Class Members arises by virtue of the parties' relationship, *i.e.*, Defendant is Plaintiff's and Class Members' medical provider.

130.    Even prior to the established relationship, Defendant's fiduciary duty to Plaintiff and Class Members arises by virtue of Defendant's position and Plaintiff's position – namely, that Defendant is a medical provider and Plaintiff's and Class Members are individuals in need of and/or seeking medical providers and/or medical services.

131.    Defendant's fiduciary duty also arose as a result of the special circumstances of the parties' relationship where Plaintiff and Class Members (as Defendant's patients or as individuals seeking information regarding medical providers and/or medical treatments) placed their trust in Defendant to protect their Private Information from unauthorized disclosures.

---

[28] Available at https://repository.globethics.net/bitstream/handle/20.500.12424/209969/DMA-Ethics-Guidelines.pdf.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

132.    As Defendant's patients and/or as users of Defendant's website for medical treatment and/or medical providers, Plaintiff and Class Members placed their trust in Defendant to protect the unauthorized disclosure of their Private Information to third parties.

133.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of Defendant's fiduciary duty.

134.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality of PHI Defendant created, received, maintained, and transmitted in providing medical services and treatment to Plaintiff and Class Members.

135.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individual PHI.

136.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons.

137.    Defendant breached its fiduciary duty to Plaintiff and Class Members by disclosing their Private Information to third parties without Plaintiff's and Class Member's advanced express written authorization and/or consent.

138.    As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

139.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of its fiduciary duty.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

## COUNT II
## BREACH OF CONFIDENCE
### (On behalf of Plaintiff and the Class)

140.    Plaintiff repeats and re-alleges each and every allegation contained in the Petition as if fully set forth herein.

141.    Medical providers have a duty to their patients to keep non-public medical information completely confidential. *See, e.g., Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 346 (Mo. App. 1983) (noting "a hospital owes a duty of care to its patients, which is independent and apart from the duty of a physician, and which includes a duty of protection."); *see also Fierstein v. Depaul Health Ctr.*, 949 S.W.2d 90 (Mo. Ct. App. 1997) (holding "Missouri courts have extended th[e] fiduciary duty of confidentiality to healthcare centers and hospitals."). *See also*, the industry standards set forth in Direct Marketing Association's Guidelines for Ethical Business Practice[29] and American Medical Association's ("AMA") Code of Medical Ethics Opinion 3.1.1; 3.2.4; and 3.3.2, *infra*.

142.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

143.    Contrary to its duties as a medical provider and its promises of confidentiality, Defendant deployed the Facebook Pixel to disclose and transmit Plaintiff's Private Information and the contents of their communications exchanged with Defendant to third parties.

144.    The third-party recipients included, but were not limited to, Facebook.

145.    Defendant's disclosures of Plaintiff's and Class members' Private Information were made without their advanced knowledge, express written consent or authorization, and were

---

[29] Available at https://repository.globethics.net/bitstream/handle/20.500.12424/209969/DMA-Ethics-Guidelines.pdf.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

unprivileged.

146. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

147. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality of PHI Defendant created, received, maintained, and transmitted

148. Defendant breached its duty of confidence to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information.

149. Defendant breached its duty of confidence to Plaintiff and Class Members by failing to ensure compliance with to keep Plaintiff's and Class Members' PHI confidential.

150. Defendant breached its duty of confidence owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons.

151. Defendant breached its duty of confidence owed to Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted in its treatment of Plaintiff and Class Members.

152. Defendant breached its duty of confidence owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted

153. Defendant breached its duty of confidence owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

154.     As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

a.     Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b.     Defendant eroded the essential confidential nature of the provider-patient relationship;

c.     Defendant took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensating Plaintiff for the data;

d.     Plaintiff and Class members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

e.     Defendant's actions diminished the value of Plaintiff's and Class members' Personal Information; and

f.     Defendant's actions violated the property rights Plaintiff and Class members have in their Personal Information.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

155.     Plaintiff repeats and re-alleges each and every allegation contained in the Petition as if fully set forth herein.

156.     Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

157.     Plaintiff and Class Members conferred a benefit upon Defendant in the form of

Private Information that Defendant collected from Plaintiff and Class Members, without advanced express written authorization and proper compensation for the disclosure of that information to third parties. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation or savings on marketing to prospective patients.

158.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

159.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Missouri and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

160.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

161.    Plaintiff repeats and re-alleges each and every allegation contained in the Petition as if fully set forth herein.

162.    When Plaintiff and Class Members provided data to Defendant's website in exchange for information regarding services available to Plaintiff and the Class Members through SSM, they entered into an implied contract pursuant to which Defendant agreed to safeguard and

36

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

not disclose their Private Information without first obtaining advanced express written informed consent.

163.    Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

164.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without first obtaining advanced express written informed consent.

165.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to a third party, *i.e.*, Facebook, without first obtaining advanced express written informed consent.

166.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for these services, had they known their Private Information would be disclosed.

167.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

### COUNT V
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

168.    Plaintiff repeats and re-alleges each and every allegation contained in the Petition as if fully set forth herein.

169.    The Private Information of Plaintiff and Class Members consist of secret, private, and confidential facts and information that were never intended to be shared beyond private

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

communications.

170.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

171.    Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

172.    Defendant obtained Plaintiff's and Class Members' Private Information through unreasonable means because Plaintiff and Class Members would not have known that their use of Defendant's Website would result in their Private Information being de-anonymized and delivered to a third party for marketing purposes.

173.    The unauthorized disclosure and/or acquisition by a third party of Plaintiff's and Class Members' Private Information via the use of the Facebook Pixel by Defendant is highly offensive to a reasonable person.

174.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

175.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

176.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it incorporated the Facebook Pixel into its website because it knew the functionality and purpose of the Facebook Pixel.

177.    Because Defendant intentionally and willfully incorporated the Facebook Pixel into its website and encouraged patients to use that website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

178.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members was disclosed to a third party without advanced written informed authorization, causing Plaintiff and the Class to suffer damages.

179.    Plaintiff, individually and on behalf of the Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

180.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII and PHI are still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

181.    Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

182.    Plaintiff, individually and on behalf of the Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' PII and PHI and to adhere to its common law, statutory, and regulatory duties.

**COUNT VI**
**CAUSE OF ACTION UNDER *BRANDT v. MEDICAL DEFENSE ASSOCIATES*, 856**
**S.W.2d 667 (Mo. Banc 1993)**
**(On Behalf of Plaintiff and the Class)**

183.    Plaintiff repeats and re-alleges each and every paragraph in the Petition as if fully set forth herein.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

184.    As a medical provider, Defendant had a fiduciary duty of confidentiality not to disclose any medical information received in connection with the treatment of the patient.

185.    If the information disclosed under circumstances where this duty of confidentiality has not been waived, the patient has a cause of action for damages in tort against the physician.

186.    The civil action for damages in tort is the sanction that puts teeth into the physician's duty of confidentiality.

187.    As Plaintiff's and Class Members' medical provider, Defendant had a fiduciary duty to protect Plaintiff's and Class Members' Private Information and not disclose it to third parties without Plaintiff's and Class Members' consent. *See, e.g., Robbins v. Jewish Hosp. of St. Louis*, 663 S.W.2d 341, 346 (Mo. App. 1983) (noting "a hospital owes a duty of care to its patients, which is independent and apart from the duty of a physician, and which includes a duty of protection."); *see also Fierstein v. Depaul Health Ctr.*, 949 S.W.2d 90 (Mo. Ct. App. 1997) (holding "Missouri courts have extended th[e] fiduciary duty of confidentiality to healthcare centers and hospitals.").

188.    Defendant's fiduciary duty to Plaintiff and Class Members arises by virtue of the parties' relationship, *i.e.*, Defendant is Plaintiff's and Class Members' medical provider.

189.    Defendant's fiduciary duty also arose as a result of the special circumstances of the parties' relationship where Plaintiff and Class Members (as Defendant's patients) placed their trust in Defendant to protect their Private Information from unauthorized disclosures.

190.    As Defendant's patients, Plaintiff and Class Members placed their trust in Defendant to protect the unauthorized disclosure of their Private Information to third parties.

191.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of Defendant's fiduciary duty.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

192.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to ensure the confidentiality of PHI Defendant created, received, maintained, and transmitted in providing medical services and treatment to Plaintiff and Class Members.

193.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individual PHI.

194.   Defendant breached its fiduciary duties owed to Plaintiff and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons.

195.   Defendant breached its fiduciary duty to Plaintiff and Class Members by disclosing their Private Information to third parties without Plaintiff's and Class Member's advanced written informed authorization and/or consent.

196.   As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

197.   As a direct and proximate result of Defendant's breach of its fiduciary duty, Defendant disclosed Plaintiff's actual, confidential medical information to third parties, including Facebook. For example, Defendant disclosed the fact that Plaintiff sought treatment on Defendant's Website for ADD and ADHD to Facebook. Specifically, Defendant's Pixel transmitted to Facebook the fact that Plaintiff clicked on the "psychiatry" tab, found a physician that treats ADD and ADHD, and then scheduled an appointment with that physician for ADD and ADHD treatment.

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

198.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of its fiduciary duty.

**COUNT VII**
**Violation of The Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010** *et seq.*
**(On Behalf of Plaintiff and the Class)**

199.    Plaintiff repeats and re-alleges each and every paragraph in the Petition as if fully set forth herein.

200.    Plaintiff brings this claim individually and on behalf of the Class against Defendant.

201.    The Missouri Merchandising Practice Act protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

202.    The MMPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020

203.    Plaintiff, individually and on behalf of the Class, is entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages.

204.    The court may, in its discretion, award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.

205.    Defendant is a "person" within the meaning of the Mo. Rev. Stat. § 407.010(5) in

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

that Defendant is a domestic "not-for-profit corporation."

206.    Plaintiff and members of the Class are "persons" under the MMPA in that they are natural persons who used Defendant's Website to search for providers of medical treatment and services, advertised on the SSM Website, book an appointment for medical treatment and services advertised on the SSM Website, and ultimately purchased medical treatment and services from SSM as a result.

207.    Plaintiff and Members of the Class searched for providers of medical treatment and services advertised on the SSM Website, booked an appointment for medical treatment and services advertised on the SSM Website, and ultimately purchased medical treatment and services from SSM for personal purposes.

208.    The MMPA applies to Defendant's conduct described herein because it protects consumers in transactions that are intended to result, or which have resulted in the sale of goods or services.

209.    The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. *See* Mo. Rev. Stat. § 407.010. Thus, the medical treatment and services sought by Plaintiff and Class Members qualifies as "merchandise" within the meaning of the Act. Additionally, the Website is a service which is used by Defendant in connection with the sale or advertisement of any merchandise in trade or commerce.

210.    "Trade" or "commerce" is defined as "the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated." SSM's advertising, offering for sale, and sale of the merchandise located thereon on www.ssmhealth.com is considered "trade" or "commerce" in the State of Missouri within the

meaning of Mo. Rev. Stat. § 407.010(7).

211.    The Missouri Attorney General has promulgated regulations defining the meaning of unfair practice as used in the above statute. Specifically, Mo. Code Regs. tit. 15, § 60-8.020, provides:

(1) An unfair practice is any practice which—

(A) Either—

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

(2) Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1., RSMo. (*See, Federal Trade Commission v. Sperry and Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (N.C. 1981); *see also*, Restatement, Second, Contracts, sections 364 and 365).

212.    Pursuant to Mo. Rev. Stat. §407.020 and Mo. Code Regs. Tit. 15, § 60- 8.020, Defendant's acts and omissions fall within the meaning of "unfair."

213.    Pursuant to Mo. Rev. Stat. §407.020 and Mo. Code Regs. Tit. 15, § 60- 8.020, Defendant's acts and omissions fall within the meaning of "unethical."

214.    The FTC Regulations and/or its interpretive decisions, the AMA Medical Opinions cited above, and the DMA Guidelines establish Defendant's behavior as "unethical" and/or it otherwise "offends public policy" and therefore Defendant's acts and failures to act as outlined

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

herein violate of the MMPA.

215.    Missouri case law provides that the MMPA's "literal words cover *every practice imaginable and every unfairness to whatever degree.*" *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). Furthermore, the statute's "plain and ordinary meaning of the words themselves . . . are unrestricted, all-encompassing and exceedingly broad." *Id.* at 240.

216.    Defendant violated the MMPA by omitting and/or concealing material facts about its Website. Specifically, Defendant omitted and/or concealed that it captured and disclosed Plaintiff's and Class Members' Private Information communicated to/from Defendant to third party Facebook regarding Private Information.

217.    Defendant's direction and employment of the tracking Pixel and its disclosure to Facebook are material to its business. Defendant did not provide advance, clear, written (or otherwise) disclosures to Plaintiff and Class Members that their Private Information would be disclosed to Facebook. Had Plaintiff and Class Members known that the tracking Pixel was embedded in the Website, they would not have used Defendant's Website.

218.    Defendant intentionally concealed the interception, collection, and disclosure of website visitors' communications via the Website because it knows that Plaintiff and Class Members would not have otherwise used its Website. Indeed, Defendant's concealment of such facts was intended to mislead consumers.

219.    Defendant's concealment, suppression, and/or omission of material facts was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the MMPA.

220.    By failing to provide advance, clear, written (or otherwise) disclosures and inform

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Plaintiff and Class Members about its interception, collection, and disclosure of Plaintiff's and Class Members' Website communications, Defendant engaged in acts and practices that constitute unlawful practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

221.    As a direct and proximate result of these unfair and deceptive practices, Plaintiff and Class Members have suffered actual harm in the form of money and/or property because their Private Information has value. The collection and use of this information has now diminished the value of such information to Plaintiff and the Class.

222.    As such, Plaintiff and the Class seek an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding actual damages; and (3) awarding reasonable attorneys' fees and costs. Plaintiff and the Class seek all relief available under Mo. Ann. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by Mo. Code Regs. Ann. tit. 15, §§ 60-7.010, *et seq.*, Mo. Code Regs. Ann. tit. 15, §§ 60-8.010, *et seq.*, and Mo. Code Regs. Ann. tit. 15, §§ 60-9.010, *et seq.*, and Mo. Ann. Stat. § 407.025, which provides for the relief sought in this count.

223.    Defendant's conduct is ongoing, and it continues to unlawfully capture the communications of Plaintiff and Class Members any time they utilize Defendant's Website and to disclose those communications and Private Information to Facebook. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

**COUNT VIII**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

224.    Plaintiff realleged and incorporated by reference all other paragraphs in the Petition as if fully set forth herein.

225.    Defendant owed a duty to Plaintiff and Class Members to keep confidential Plaintiffs' and Class Members' Private Information and to protect this information from disclosure to third parties such as Facebook unless mandated by law or to obtain advanced, express, written, informed consent from Plaintiff and the Class Members before disclosing such information.

226.    Defendant had the ability to safeguard the Private Information entrusted to it, or to anonymize the information, and failed to take the steps to do so.

227.    Defendant negligently incorporated the Pixel and/or other third-party tracking cookies into its Website and/or MyChart patient portal without understanding how the Pixel and/or other third-party tracking tools would transmit Plaintiff's and Class Members' Private Information without their consent.

228.    Plaintiff and Class Members have been harmed in an amount to be determined at trial by Defendant's implementation of the Pixel and/or other third-party tracking cookies into its Website and/or MyChart patient portal, which resulted in the transmittal of Plaintiff's and Class Members' Private Information without Plaintiffs and Class Members' consent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiff and their Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private

Information of Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive

and other equitable relief as is necessary to protect the interests of Plaintiff and

Class Members:

D.     For an award of damages, including, but not limited to, actual, consequential, and

nominal damages, as allowed by law in an amount to be determined;

E.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.     For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

DATE: May 25, 2023                    Respectfully Submitted,

*/s/*     Tiffany Marko Yiatras
Tiffany Marko Yiatras, MOED Bar No. 58197MO
**CONSUMER PROTECTION LEGAL, LLC**
308 Hutchinson Road
Ellisville, Missouri 63011-2029
Tele: 314-541-0317
Email: tiffany@consumerprotectionlegal.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
*gklinger@milberg.com*

Bryan L. Bleichner*
Philip J. Krzeski*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401

Electronically Filed - City of St. Louis - May 25, 2023 - 03:28 PM

Phone: (612) 339-7300
Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**The Lyon Law Firm**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice* forthcoming